Conn, J.
 

 The jury having been impaneled and sworn, the prosecuting attorney, in the course of the statement of the case, said among other things:
 

 “The state expects the evidence to prove that at the same sitting of the grand jury an indictment was returned against Earl Stanley.”
 

 Subsequently the prosecuting attorney said:
 

 “The state expects the evidence to further prove that at the September term an indictment was Returned against Earl Stanley, charging him with aiding and abetting B. B. Barger and Bonnie F. Barger in the commission of blackmail against O. C. Heath.”
 

 Later the prosecuting attorney said:
 

 4‘The, state expects the evidence further to prove that this intimacy had gone to such an extent that the people of Piekreltown set out to horsewhip Earl Stanley if he didn’t cease paying attention to Mrs. Barger.”
 

 The defendants interposed an objection, whereupon the court said:
 

 “The prosecutor may state what he expects to be material, what he expects to prove, as he may believe is material to the issues presented by the indictment and the plea. The questions on introduction of testimony will arise at the time and will be ruled upon then.”
 

 The prosecuting attorney further said:
 

 “We expect the evidence further to prove that
 
 *450
 
 some gentlemen in that part of the country told Earl Stanley of this intimacy; that it was known; that he deserved to be whipped, and they would assist in whipping him if he didn’t stop paying attention to Mrs. Barger.”
 

 The prosecuting attorney also made this statement:
 

 “We expect the evidence further to prove that in some manner the story leaked. The news got out, and it was brought to the attention of the grand jury, and that testimony was introduced looking toward the indictment of Mr. C. C. Heath for assault with intent to commit rape.”
 

 Still later the prosecuting attorney made this statement:
 

 “We expect the evidence further to prove that since this indictment was returned, or these indictments, Mr. Earl Stanley has been to Mr. C. C. Heath in the courthouse, in the presence of the sheriff, and the other deputy, and asked that this case be postponed and postponed and postponed until it was finally forgotten.”
 

 During the course of the statement the prosecuting attorney told the jury evidence would be offered to prove that the intimacy between Stanley and Mrs. Barger had gone to such an extent that a relative of Stanley, a woman, “mostly out of regard for Earl ¡Stanley’s wife,” wrote to a brother of Earl Stanley, charging that he and Mrs. Barger were living in open adultery. Defendants, by objections and motions, properly saved the questions.
 

 The statements of the prosecuting attorney as to these several matters were prejudicial to the rights of defendants.
 

 
 *451
 
 Whatever properly might' have been shown in evidence to connect Earl Stanley with an active participation in the matter, certainly the fact that a grand jury had indicted him in a separate indictment presented nothing for the jury to consider in the case against the Bargers. Nor was it proper for the prosecuting attorney to inform the jury that the people of Pickreltown set out to horsewhip Stanley; because, first, unless some positive action was taken against Stanley, such statement would be purely hearsay and highly speculative; and, second, anything done in the absence of the Bargers and without their participation or acquiescence could not bind them. It is not apparent how the threats of third parties to commit a crime, wholly unrelated to the crime of blackmail, could have had any possible probative effect in this case.
 

 Prosecuting attorneys, along with their other duties, are charged with seeing that the defendant on trial is given a fair trial. Their duty in this respect is subordinate only, if at all, to that of the trial judge. Matters such as those above referred to, injected at the initial steps of the proceeding, are almost certain to deprive a defendant of that fair trial which is guaranteed to every accused.
 

 Our attention is called to the fact that more than 1,000 objections to the admissibility of evidence were made on behalf of defendants during the progress of the trial. We shall refer to a few matters of evidence, upon which the objections complained of as numerous are based, to see whether the objections’ are frivolous or substantial:
 

 
 *452
 
 Charles W. .Swallow, a deputy sheriff of Logan county, when on the witness stand, was questioned as follows:
 

 “Q. You may state if you are a member of the Ku Klux Klan?” (The defendants objected to the question on the ground that it was irrelevant. The objection was overruled, to which the defendants excepted.) “A. I would say that I am not a member of the Ku Klux.”
 

 The defendants moved the court to rule out the answer. The motion was overruled, to which the defendants excepted.
 

 “Q. Are you a member of the Invisible Order of the Knights of the Ku Klux Klan?” (Defendants objected; the objection was overruled, and defendants excepted.) “A. I will say that I am a member of the Invisible Empire, Knights of the Ku Klux Klan of the Imperial Order of Ohio, and I am proud of it. * * *
 

 “Q. When, prior to the conversation in the Klan Hall — so-called Klan Hall; I don’t know whether I get the right terminology — (A. I will prompt you if you go wrong) — had you seen Mr. Stanley? A. Well, I don’t know how long before this that Mr. Stanley told me the circumstances connected with this case and asked my advice.
 

 “Mr. Huston: I understand the Bargers were not there; is that correct, Mr. Swallow, the Bargers were not there? A. No, sir. I couldn’t say positively just when it was that I saw Mr. Stanley. I didn’t keep these dates down in my mind; didn’(¡ set them down in a book.
 

 “Q. Do you recall now, Mr. Swallow, that the first time you saw him, subsequent to the 20th day
 
 *453
 
 of July, 1923, there was a conversation relative to this ease? A. Well, I don’t know what the date was. I am not positive about the date, but, as I stated before, Mr. Stanley told me the circumstances. I don’t remember the date. Mr. Stanley and I met — I don’t remember whether it was down on the street or whether it was in the hall, I don’t recall — and Mr. Stanley related—
 

 “Q. Was the conversation you had with Mr. Stanley relative to this case? "A. Yes.
 

 “Q. Was it at that time that you advised him to see the prosecuting attorney? A. It was.”
 

 An objection was noted to each inquiry, and each question was properly saved.
 

 It is impossible to see how a conversation between the deputy sheriff and Stanley could have any probative force against the Bargers, as the record affirmatively shows the Bargers were not present at the time of the conversation, and there was nothing to show Stanley was acting for them, nor was the latter (Stanley) a witness in the case.
 

 Later, the prosecuting attorney asked this question: “State, Mr. Swallow, whether or not Mr. B. B. Barger is a member of the same organization,” referring to the organization he theretofore had inquired about. The defendants objected to this question, and the court overruled the objection.
 

 We have understood, unless the affairs of a fraternal, religious, political society, or of an organization, are involved in issue, that it is never competent to show that a witness has membership in such an organization. Notwithstanding the ruling of the court, the witness properly resolved the objection to the question, because the witness an
 
 *454
 
 swered:
 
 “I
 
 object
 
 to
 
 that. I won’t answer that question.” So tbe error committed in overruling tbe objection was cured.
 

 One L. Edson Stanley was called as a witness, and stated that he had been “interviewed” in the absence of the Bargers. Thereupon the question was asked:
 

 “You may state, Mr. Stanley, if Mr. Earl Stanley advised you that he had been authorized by the Bargers in this case.”
 

 There was an objection, but the trial judge said he would permit the question to be answered with the understanding that it be “connected up” later, or be ruled from the jury. Thereupon the witness testified as to the conversation with Earl Stanley, who, as heretofore stated, was not a party to nor witness in this case. While the order of proof is a matter for the court, it is the safer practice, especially in a criminal case, to require proof in the first instance which makes the evidence competent. Nothing in the record has been called to our attention which made this testimony relevant.
 

 On redirect examination this same witness was asked and answered certain questions as follows:
 

 “Q. Did you talk to Mr. and Mrs. Barger before you saw Mr. Earl .Stanley on that Monday? A. I talked to Mr. Barger Monday morning in the field.
 

 “Q, In the field? A. Yes.
 

 “Q. Was this matter mentioned? A. No, sir.
 

 “Q. When was the first time you heard it? A. Monday about noon.
 

 “Q. From whom did you get the information? A. The information concerning what had happened?
 

 “Q. Yes. A. From Stanley.
 

 
 *455
 
 “Q. From Mr. Earl Stanley? A. Yes.”
 

 Again, this evidence of a transaction in the absence of the Bargers was irrelevant, unless Stanley was authorized to speak for them. If in a civil action agency may not be proved by the declarations of the agent, certainly it should not be the law that a more relaxed rule will govern in a criminal case.
 

 Charles F. Wooley, sheriff of Logan county, was called by the state as a witness:
 

 “Q. You may state, Mr. Wooley, if some time in the last few days, or since this indictment against Mr. and Mrs. Barger has been returned, Mr. Stanley, Mr. Earl Stanley, has been in your office. A. Yes, he was in the office once, one day.
 

 “Q. State whether or not anything was said by Mr. Stanley relative to the postponement of this case. A. Why, yes, he suggested to Mr. Heath that he would postpone this case from time to time and after while it would drop out.”
 

 For reasons heretofore given this was prejudicial.
 

 C. C. Heath, deputy sheriff, was called, and testified that Earl Stanley came to the sheriff’s office, and asked him, Heath, to do what he could to get the case postponed, saying, among other things, that it could be done; that if other oases could be done this could be also. Then, Heath claims, Stanley asked him to see the judge or somebody and get a postponement from one time to another, and finally let it drop out.
 

 Thus again error was committed, because, if Stanley was referring to his own indictment, er
 
 *456
 
 roneously brought into tbe record by the prosecuting attorney, it could have no bearing whatsoever upon the indictment against defendants in error. If, on the other hand, Stanley was referring to the indictment against the defendants in error, it would be equally improper to bind them by a statement made in their absence, or the absence of one of them.
 

 Deputy sheriff Swallow was again called as á witness, and testified as follows:
 

 “Q. Do you recall, Mr. Swallow, when you informed me of this situation? A. Yes, sir; the first that I informed you of it was in the judge’s office.
 

 “Q. Do you recall whether or not the grand jury was in session then? A. It was.
 

 “Q. Do you recall whether or not I was called from the grand jury room? A. I couldn’t say.
 

 “Q. Subsequent to the time that you came into the judge’s office, Judge Hover’s office? A. I know you came into the office, but whether you were called from the grand jury room or not I don’t know.
 

 “Q. I will ask you to state if, subsequent to that time, you were called as a witness in the grand jury room? A. I was called, I think, the next day as a witness before the grand jury.
 

 “Q.
 
 I will ask you to state whether or not you were a witness before the grand jury, looking toward an indictment against C. O. Heath?”
 

 There was an objection to each question, and all objections were overruled, except the one to the last question. This testimony was not admissible. It may not have been highly prejudicial, for the court ruled against the most objectionable question, but this evidence tended to confuse the jury by
 
 *457
 
 injecting another of the many collateral matters found in the record. It is always to be presumed in the absence of a motion to quash or other special plea an indictment was found and returned according to law.
 

 The defendant B. B. Barger was called as a witness, and the prosecuting attorney asked him certain questions as follows:
 

 “Q. Mr. Barger, are you a member of the Ku Klux Klan? A. I am not.
 

 ‘ ‘ Q. Are you a member of the Invisible Order of the Knights of the Ku Klux Klan? A. I am not.
 

 “Q. Are you a member of any affiliated order of such as that? A. I am not.”
 

 No reason has been assigned which justified the asking as to membership in this or any organization.
 

 When defendant Mrs. Barger was on the witness stand she was asked by the prosecuting attorney whether she had not testified to certain facts before the grand jury; an objection was interposed, but the court held that such questions and answers were proper for the purpose of impeachment, and that unless they contradicted or impeached other statements made by the witness the jury were not to consider them. It is quite apparent the witness had not denied some of the statements made, and that by making use of the transcript of her evidence before the grand jury, same was gone over in detail before the petit jury.
 

 As stated, some of her answers before the trial jury may have been in contradiction of her statements before the grand jury; nevertheless, we think the court’s' ruling was erroneous. The court should have advised himself whether or not there had been a direct or a quali
 
 *458
 
 fied contradiction before permitting testimony tending to impeach. This not only would save a witness from the possibility of being put in a false position, but would tend to expedite the trial. Likewise defendant Barger, when on- the stand, was asked as to certain matters testified to- by himself before the grand jury. The same observations apply.
 

 After this class of evidence had been adduced at length the court said:
 

 “I think I -can save a little time here. The court has been in doubt on the question as to the introduction of testimony offered by the defendants before the grand jury. At the time the objection was made the objection was overruled. It appears from the' testimony offered that the defendants now on trial came into the grand jury room in response to summons, subpoenas, and there gave testimony. The court at this time will sustain the objection to the testimony offered by the defendants in the grand jury room, and will instruct the jury to disregard the testimony offered by the defendants before the grand jury.”
 

 Notwithstanding this ruling, several witnesses thereafter were called by the state to testify to what happened when the Bargers were before the grand jury. For instance, French -Epps, a member of the grand jury, was called. The following questions and answers are noted in his testimony:
 

 “Q. You may state, Mr. Epps, whether or not that examination was done in a rude and ungentlemanly manner or in a fair and gentlemanly manner? A. I would imagine it was very gentlemanly.
 
 *459
 
 I wouldn’t see anything out of the way at all, any rudeness that I could see.
 

 “Q. Was the examination of Mrs. Barger conducted in any manner different than that of other witnesses? A. I don’t think so.
 

 “Q. Did you notice whether or not Mrs. Barger was unduly excited?”
 

 Mrs. Mary E. Cheever and Mrs. Mary K. Morgan, both members of the grand jury, testified similarly.
 

 Aside from the impropriety of offering and receiving this testimony after the court had ruled that the evidence taken before the grand jury was not receivable, these answers- did not tend to prove any issue in the case, and, furthermore, they were mere conclusions of the witnesses. But the serious error, the statement of the trial judge that he was in doubt as to the admissibility of the evidence, if made in the presence of the jury, as evidently it was, was unfortunate in that it might have left the jury in a most uncertain state, especially where, as here, so many collateral matters were presented for their consideration.
 

 Subsequently, when asked to rule with reference to an item of testimony which it was claimed had been excluded, the court said:
 

 “There is still a doubt in the mind of the court as to whether or not the statements of defendants in the grand jury room, on impeachment, are not proper to go in evidence; but the court will rule now, broadly, that the testimony of defendants offered in the grand jury room, whether it be in chief, or whether it be for the purpose of impeachment, may be ruled from the consideration
 
 *460
 
 of the jury, and the question about it will be resolved in favor of the defendants.”
 

 The trial judge, of course, was desirous of keeping the record free of error, but testimony having gone to the jury, and there was much of it, which afterwards was excluded on a motion to strike out, the expression of the court made directly to the jury that he still had a doubt might have had a tendency to permit the ruled-out evidence to be misapplied by the jury. The court personally may be cognizant of a well-founded mental reservation, and during the term may cure his own error on motion for new trial, if further deliberation on his part suggests such a course, and same is curable also on review; but to the jury the trial judge’s rulings should be absolute, for, while the view of the members of that body on questions of fact may be ascertained by interrogatories, it is impossible to explore the jury’s mind to determine the effect of an ambiguous ruling on the part of the court.
 

 Without referring to all of the items of evidence, a sufficient number have been pointed out amply justifying the reversal of the judgment by the Court of Appeals on the ground of error in the admission of evidence. Since the case will go back for another trial, it is suggested that when it again is tried, in addition to omitting inquiries as to wholly irrelevant matters, the salutary rule that leading questions be not asked also should be observed.
 

 With reference to the assignment of error that the requests to charge made by defendants before
 
 *461
 
 argument were refused, and that there was error in so refusing, since in a criminal ease the court is not required to give requested instructions prior to the argument, even though they correctly state the law, but may instruct on such points in the general charge
 
 (Wertenberger
 
 v.
 
 State,
 
 99 Ohio St., 353, 124 N. E., 243), we do not at this time pass upon the language of the several requests submitted. On the retrial which will take place it may come about that the court will so instruct the jury in the general charge that specific requests, even if submitted before argument, will not be insisted upon; that is to say, the order of procedure doubtless will be as the developments at the trial require, and no hard and fast rule as to the precise language to be employed will be laid down at this time. Reference will be made hereinafter to the case of
 
 Mann
 
 v.
 
 State,
 
 47 Ohio St., 556, 26 N. E., 226, 11 L. R. A., 656, and our interpretation of that case will serve as a guide to he followed on the next trial.
 

 In the argument of the prosecuting attorney to the jury, there having been a dispute as to the effect of certain testimony, that official said:
 

 “It was a weak spot, I believe that was the exact word, a weak spot in her story. Should the grand jury have indicted Heath, when the former prosecuting attorney himself did not think that the case could be maintained?”
 

 It is quite possible that this same grand jury investigated the transaction against Heath, but what that body did as regards Heath was wholly unimportant on this trial. It is also quite possible that an investigation of these two matters by the
 
 *462
 
 same grand jury may have resulted in some of the testimony serving a dual purpose, but this, instead of permitting the Bargers’ testimony before the grand jury to have been given to a petit jury, should have constrained the court to be more careful to keep out the inadmissible portions.. In any view, the reference of the prosecuting attorney to the opinion of a former prosecuting attorney as having any probative force as. to the legality of the Bargers’ claim or claims, if any they had, was improper since this was not the subject of “opinion” evidence.
 

 The prosecuting attorney further said:
 

 “# *
 
 *
 
 The Mr. Stanley who, after the'finding of this indictment, went to the sheriff’s office and asked Mr. Heath in the presence and hearing of Mr. Wooley to do all he could to use his influence with the judge of the court of common pleas of Logan county, to have this case postponed and postponed and postponed until it finally was dropped and forgotten.”
 

 As heretofore stated, Earl Stanley was not a witness in the case. There was no evidence to show that he represented the Bargers in going to the sheriff’s office. This argument was. highly prejudicial. Anything that tended to connect Stanley in fact with the matter, in so far as it tended to show a conspiracy, or a motive, or such relations with the Bargers as would justify coupling his name with theirs or either of them, might be pertinent in argument, but in no possible aspect of the case could the fact of an indictment against Stanley have been the subject of evidence, or justify basing an argument on that fact.
 

 Coming now to the charge of the court, com
 
 *463
 
 plaint is made that the Court of Appeals was not justified in its finding that the trial court misapplied the rule laid down in the
 
 Mcmn case.
 
 To determine this question, it is necessary to understand precisely the record in the
 
 Mcmn case.
 
 Mann was indicted for threatening William Brigham and Almyra Brigham with having committed the crime of administering poison to two colts, the property of Mann, with intent to extort, etc. The sufficiency of the indictment was attacked in the common pleas and circuit courts, and was necessarily disposed of by the. judgment there, but this; court went further and declared the law, in the-, second and third propositions of the syllabus, as-follows: . -' ...... ■ •
 

 “A demand made by the owner upon the offender,, for a reasonable compensation for property orfeii'.. nally destroyed by the latter, the owner at the time accusing him of the crime, and threatening to prosecute him therefor if the demand is not complied with, does not come within the provision of Section 6830 of the Revised Statutes.
 

 “Where one is indicted for accusing or threatening to accuse another of a crime punishable by law, with intent to extort or gain from him money or other valuable thing, the truth of the accusation may be material for the defense, in determining the intent with which the defendant made the accusation.”
 

 In the opinion An the
 
 Mann case
 
 this court said, at page 563 (26 N. E., 228):
 

 “An honest effort on the part of a creditor to collect a just debt by accusing or threatening to accuse the debtor, of a crime with which the debt is connected, or out of which it arose, does'not, in our
 
 *464
 
 opinion, com© within the purview of the statute. Nor should the statute be construed as covering the case of an owner who demands from the offender a reasonable compensation for property which he has maliciously and criminally destroyed, and accompanies his demand with a threat to accuse the offender of the crime.”
 

 In that case the court necessarily was dealing only with the facts involved in the transaction under consideration, which had to do with the destruction of personal property, and which gave rise to a debt.
 

 In the case at bar the trial court in its charge said:
 

 “A claim for damages for injury to the person is not debt, even had it been contained in the written communication as alleged to have been made and delivered to Heath; the alleged written communication threatening to accuse him was for assault with intent to commit rape, not being based upon the destruction of property nor the existence of debt.”
 

 The trial court in its charge also said:
 

 “In this connection, however, you may take into consideration as bearing upon the intent of the defendants, if you find they did so make and deliver to Heath such a written communication, threatening to accuse him, the evidence tending to prove the truth of such alleged accusation; but you can use it and apply it no further than in determining the intent defendants had in making such accusation, if they did so threaten to accuse. ’
 
 ’
 

 The court should have refrained from making the statement to the jury that a claim for damages for injury to the person is not a debt, because
 
 *465
 
 thereby it might have been understood by the jury that the sort of claim under consideration in the instant case was not the subject of settlement; on the contrary, the court should have instructed that any valid claim, even though sounding in tort, was a proper subject of settlement between the parties, if in good faith they elected to adjust such a difference.
 

 "While the charge as given may have been sufficiently clear to a lawyer, it might not have been so to the jury and the rule is well known to be that where the jury are given two instructions, one proper and one improper, it is not to be assumed that the correct instruction was followed.
 

 In another part of the charge the court said:
 

 “As stated in the beginning of the charge, one cannot be tried for felony in the state of Ohio until an indictment by the grand jury of the county wherein the crime is alleged to have been committed has returned an indictment describing and setting forth the crime charged. O. O. Heath has not been indicted and you are not trying him on an indictment here. Every person charged with crime has the right to be confronted with the accusation by a lawful indictment and to plead thereto, and if a plea is ‘not guilty’ he is entitled to meet his accuser and witnesses face to face and to a public, speedy, and fair trial. O. C. Heath has had no opportunity to plead to an indictment charging him with assault with intent to commit rape. After an indictment is returned by the grand jury against an accused, the only way the truth of the crime charged can be ascertained is by a plea of guilty or by the conviction of a petit jury in a fair trial. C. C. Heath has .not pleaded guilty to a charge of assault with intent to commit
 
 *466
 
 rape; nor has he been convicted for such crime by a petit jury; nor has he been indicted for such offense. O. C. Heath is not on trial now,- and it is not within the province of this jury to determine the truth or falsity of the alleged charge with which he is now alleged to have been threatened with accusation by the defendants; but rather the duty of the jury is to determine whether or not the defendants threatened to accuse Heath with assault with intent to commit rape and thereby and with intent to extort money from him. Was the' threat to accuse Heath made as charged, and if it was made by defendants, was it made with the intent on the part of defendants to extort money from Heath? If the alleged threat to so accuse him was made with the intent to gain or extort money from Heath within the county of Logan and state of Ohio, on or about the time laid in the indictment, then you would be warranted in returning a verdict of guilty.”
 

 The court with propriety might have told the jury that O. C. Heath was not on trial in the instant case, and that whatever, if any, accusation against him there then was or ultimately might be was not a matter for the determination of this jury. But when the court told the jury that C. C. Heath had been indicted, it was quite probable, even though unintended by the court, that the jury Avould draw the inference that this absolved Heath from having committed any assault, and therefore the truth or falsity of the claimed offense by Heath was not to be considered. While exactly the opposite of this instruction was given at another time, such an error, as hereinbefore suggested, is not thereby cured.
 

 
 *467
 
 The court’s observation that Heath had no opportunity to plead to an indictment charging him with assault with intent to commit rape might have led the jury to infer that Heath had been deprived of some right for which the Bargers were responsible. The court went still further and said, “nor had Heath been convicted of such crime,”' and also repeated that Heath had not been indicted, and finally said it was not within the province of the jury to determine the truth or falsity of the alleged charge with which Heath had been accused. And yet the jury at all times were concerned with the truth or falsity of the charge against Heath as bearing on the question of intent on the part of defendant.
 

 The Court of Appeals, therefore, was clearly right in saying the trial court did not follow the reason and principle declared in the
 
 Mcrnn case, supra.
 
 "While the
 
 Mann case
 
 has been said to go beyond what has been held to be the law in other states, we think it states the sound rule, and therefore reaffirm the principle therein enunciated, and, as hereinbefore stated, the interpretation now placed upon the
 
 Mann case
 
 is to be used as the basis for instructing the jury on the next trial of this cause.
 

 The court also charged the jury as follows:
 

 “In determining the intent of the defendants, if you find they did so threaten to so accuse Heath, you may take into consideration the evidence tending to prove that an affidavit or written communication, signed and sworn to by Bonnie F. Barger, threatening to accuse Heath with assault with intent to commit rape upon her person, wherein, so far as the court remembers the evidence, making
 
 *468
 
 no claim against Mm for damages in the written communication, and did not mention a civil suit to collect damages or claim any damages or sum of money, hut, as claimed, the written communication threatened to accuse him with a crime punishable by law, to wit, assault with intent to commit rape. You may consider the evidence tending to prove these facts as bearing upon the intent of Bargers or either of them, if you find they did so threaten to accuse Heath. For what purpose and with what intent, if such written commumeation was sent or delivered to C. C. Heath? And in determining this question of intent you may consider the evidence tending to prove that the defendants were in an adjoining room of the law office when he, C. C. Heath, was called to another room of the same office, where the written communication was delivered to Mm, its contents read and made known to him, and a verbal proposition that he pay money; also the evidence tending to prove that money was paid in the sum of $500 to defendants or to another for them, or for one of them, by Heath, and that it was accepted and taken by defendants. You may also take into consideration, as bearing upon the intent of defendants, the evidence tending to prove that no criminal proceedings or proceeding were instituted against him, that is, by filing an affidavit against Mm, charging Mm with assault with intent to commit rape; the evidence tending to prove that no complaint was lodged against him with any magistrate or the prosecuting attorney of the county or any charge upon which an arresting officer could make an arrest. You may also consider in tMs connection as bearing upon the intent of defendants, if you find they did so threaten to
 
 *469
 
 so accuse Heath, the evidence tending to prove that the alleged written communication and the memorandum concerning the alleged transaction were destroyed and thereby placed beyond the reach of Heath or any officers of the law, if you find such papers existed and were so destroyed.
 

 “You may also consider, as bearing upon the intent of the defendants, the evidence tending to prove that since the payment of the $500 by Heath to defendants, if you find he did so pay, the silence of the defendants, their conduct, with reference to the threat to so accuse him, if you so find.
 

 “You may also consider the evidence tending to prove that the defendant Bonnie F. Barger did not relate the occurrence and circumstances of the alleged act upon which the alleged threat to accuse Heath with assault with intent to commit rape upon her person, to her husband, defendant B. B. Barger, until after she had related it to Earl Stanley.
 

 “You may consider the evidence tending to prove that opportunity was afforded after the time she claims the event at her home took place on the 20th of July, before Earl Stanley appeared the next morning; and evidence tending to prove that there was opportunity to have communicated it to her husband at the lunch hour and through the day; and evidence tending to prove that she did not so communicate it to her husband until in the evening of the 21st day of July, when it was first communicated to her husband in the presence of Earl Stanley.
 

 “You may also consider the evidence tending to prove the acts and conduct of defendants before and after the written communication referred to above was sent to or caused to be delivered to C.
 
 *470
 
 C. Heath; and you may take into consideration, as bearing upon the intent of defendants, if you find they or either of them threatened to accuse C. C. Heath, the evidence tending to prove the financial condition of the defendants, at the time the written communication was caused to be delivered to C. C. Heath, if you find such written communication was so caused to be delivered to him. # * *
 

 “You may also consider the evidence in determining the intent of the defendants, if you find such threat to so accuse Heath was made against him by the defendants, tending to prove that at the time such communication was made and delivered to him that he was a public officer serving as an active deputy sheriff of Logan county, Ohio, and the effect such threat to accuse would probably and reasonably have upon him, the age of Heath, the standing and situation of himself and his family, the position he occupies in the community; and if you find that such written communication as described in the indictment was made by the defendants or either of them and delivered or caused to be sent or delivered to Heath, threatening to accuse him of assault with 'intent to commit rape, was it so done with intent on the part of the defendants to extort money from Heath? And if you so find, then your verdict should be guilty. * * *
 

 “There has been evidence permitted to go to the jury tending to prove that when C. C. Heath was sent for and called to the law office where the defendants were waiting, that he signed certain writing, which writing has been destroyed, agreeing to pay $500 on or before a few days after the date he was sent for. If you find from the evidence that C. C. Heath was impelled to so agree against
 
 *471
 
 his will and by reason of the alleged threat to accuse him of a crime punishable by law, that is, an assault with intent to commit rape on the person of Bonnie F. Barger, and if such threat to so accuse him was made for the purpose and intent of extorting money from him, he would not be bound to pay, notwithstanding the fact, if it be so proven, that he signed an instrument in writing agreeing to pay.”
 

 A careful analysis of this portion of the charge, when considered in connection with the evidence in the case, inevitably leads to the conclusion that the court erred in what may be called the “summing up,” because undue prominence was given to and strained inferences drawn from certain portions of the evidence.
 

 It is the law of Ohio, as declared in
 
 Morgan
 
 v.
 
 State,
 
 48 Ohio St., 371, 27 N. E., 710, that it is not improper for the trial judge to sum up the evidence, providing it is fairly done. It is apparent from that case that there must be such an analysis as will neither unduly emphasize items of evidence on one side nor eclipse equally important items of evidence on the other side. It is not the purpose of this court to restrict in any wise the judges of that tribunal which Blaekstone called “the great court of common pleas” in giving the jury all the information they need as regards the facts properly adduced and the significance thereof, because, after all, every item of evidence bearing on every relevant circumstance should be in possession of that body. But jurors are prone to follow the views of the trial judge, and it is known of all lawyers that the triers of the facts endeavor to ascertain from the judge’s rulings what his conclusions are on particu
 
 *472
 
 lar items of evidence. Because of this, many of the judges give the conventional instruction that the jury in arriving at conclusions should not be guided by any supposed belief on their part as to the judge’s view of the facts as indicated by rulings during the course of the trial.
 

 The instructions just quoted had to do entirely with matters of evidence relating to one side of the controversy. For instance, the jurors are advised they may take into consideration the written communication signed by Mrs. Barger pertaining to the accusation against Heath, the court, among other things, saying:
 

 “Wherein, so far as the court remembers the evidence, making no claim against him for damages in the written communication, and did not mention a civil suit to collect damages.”
 

 This affidavit, called such in view of the classification given it on the trial, was prepared by counsel for the Bargers. It may or may not have been of importance that the paper was silent with regard to a possible civil suit to collect damages. If the affidavit were made in connection with or supplemented by oral statements, it might be that the failure of the affidavit to mention the question of a civil suit would be unimportant or even unnecessary in the writing; if so, the court’s instruction above referred to would be misleading. Whether or not the document was as complete as it might have been would not necessarily conclude the defendants if they were in good faith in the transaction. Ther affidavit was drawn by counsel; whatever omissions there were may have been due to counsel Until it was shown that the Bargers
 
 *473
 
 withheld something that properly should have been in the affidavit, such comment was improper.
 

 The court also advised the jury that in determining the question of intent they might consider the evidence tending to prove that the defendants were in an adjoining room of the same suite while the contents of this paper were made known to Heath. This well might have been the subject of argument of the fact by the state to the jury, but certainly it was not a matter of sufficient importance upon which to call forth á specific instruction and by referring to it the court emphasized it unduly. An inquiry might have disclosed that this procedure was at the instance of Mr. Long, counsel for the Bargers, but in and of itself the matter should not have been referred to in the summing up, unless other obvious deductions were drawn.
 

 The court told the jury they might take into consideration as bearing upon the question of intent the evidence tending to prove that, no criminal proceedings had been instituted against Heath by filing an affidavit, and no complaint lodged against him with any magistrate or with the prosecuting attorney of the county on any charge upon which an officer could make an arrest. It would have been entirely proper to say the jury might take into consideration, as bearing upon the intent, the evidence tending to show that no proceedings were instituted by the Bargers, if none were, provided the court also had said it would not necessarily be fa,tal to the Bargers’ good faith that no proceedings in fact were instituted. The Bargers were not required as a matter of law to institute proceedings, and if the claim was
 
 bona fide
 
 and had been liquidated they might have felt disposed to re
 
 *474
 
 frain from instituting criminal proceedings, because by doing so they obviously would have called attention to a matter which by them might have been thought humiliating or embarrassing.
 

 The court further instructed the jury to consider the evidence tending to prove that the written memorandum was destroyed and thereby placed beyond the reach of Heath or any officer of the law. This instruction might have been proper if it were shown in evidence that the Bargers intended or desired to destroy the book, or took steps to have it destroyed, and that its destruction was for the purpose of preventing it reaching the officers of the law. This also might properly have been the subject of argument by the state to the jury, but the court’s reference to it as having been kept from officers of the law certainly must have left the impression upon the jury, although not so intended by the court, that the mere failure to preserve the papers was in and of itself condemnation complete. The act was an incriminatory one, or not, depending on the intent, and therefore it was not the proper subject of a one-sided reference in the charge.
 

 To the same effect is the instruction regarding silence on the part of the Bargers after payment was made. There may have prevailed a number of reasons for no activity on the part of the Bargers as regards subsequent proceedings. This again was a matter susceptible of fair argument to the jury by the prosecuting attorney, but it was not a matter upon which specific instructions by the court were either necessary or proper.
 

 Finally the court told the jury they might consider the fact that Heath was a deputy sheriff,
 
 *475
 
 also Ms age, standing, the situation of himself and family, and similar matters, to determine whether the acts of the Bargers, such as they were, were done with the intent to extort, and instructed that if the jury so found the verdict should be “guilty.” Why not also say that if the Bargers were people of standing in the commuMty, and the effect of filing an affidavit by Mrs. Barger for the arrest of Heath, a deputy sheriff, might have had a tendency to degrade or humiliate her in the eyes of the public, and that if she in good faith believed she had a valid claim, and, having settled it, refrained from filing proceedings, then and in that event the jury should consider such matters also in arriving at their verdict? Or, again, why not charge the jury that a deputy sheriff, being more or less familiar with legal proceedings and the methods of violators of law, would not likely be an easy victim of blackmailers? One need only casually read the instruction given by the court to perceive the absurdity of it and to realize how dangerous a partial summing up always is and necessarily must be.
 

 We think the trial court erred in this respect, and because of this, and for the other reasons given, the judgment of the Court of Appeals is affirmed.
 

 Judgment affirmed.
 

 Marshall, C. J., Robinson, Matthias, Day, and Allen, JJ., concur.
 

 Jones, J., not participating.